(C. D. 900)

GEO. WM. RUEFF, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided December 13, 1944)

*Tompkins & Tompkins* (*J. Stuart Tompkins* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*John J. McDermott* and *Joseph E. Weil,* special attorneys), for the defendant.

Before OLIVER, WALKER, and COLE, Judges

WALKER, Judge: In this case plaintiff claims that drawback should have been allowed under section 313 (a) of the Tariff Act of 1930 on certain steel drums manufactured in the United States with the use of imported merchandise, and alleged to have been exported in accordance with the law and regulations thereunder. Drawback was denied for the reason that the goods had not been inspected prior to lading and exportation, as required by certain regulations which will be hereinafter set forth.

From the record it appears that the Wilson & Bennett Manufac-

turing Co. of New Orleans received certain imported sheet steel and therefrom manufactured 20,000 55-gallon, 18-gauge drums which were embossed on one end with a "D," evidently to indicate drawback, and a number, 1010, to indicate the lot of imported steel from which they were made. These markings were evidently made in accordance with the terms of the so-called drawback rate reported in T. D. 47382 (G).

It appears that the 20,000 drums were delivered to the Cities Service Oil Co., the exporter herein, but this case involves only 7,667 of such drums. As to these, evidence was offered to show that in fact they were filled with gasoline and actually exported on a vessel named the *Toyohashi Maru*. The issue herein, however, is limited to the question of whether or not the regulations prescribed by the Secretary of the Treasury under the authority conferred in the drawback law (section 313 (i)) were complied with, and it is well settled that compliance with such regulations is a condition precedent to securing drawback. *United States* v. *Ricard-Brewster Oil Co.*, 29 C.C.P.A. 192, C.A.D. 191.

There is no question but that all customs regulations with respect to drawback were complied with except two, articles 1053 and 1054 of the Customs Regulations of 1937. So far as pertinent, these read as follows:

Art. 1053. Inspection, gauging, sampling, weighing.—(a) It is essential in the administration of the drawback law that exporters must in all cases provide the requisite opportunity and the necessary facilities for official inspection, sampling, and ascertainment of quantities. * * *.

(b) * * *. Inspection, sampling, weighing, gauging, and measuring will not be made at a place other than stations, yards, piers, and other regular places of lading where customs officers are stationed for the purpose, except where it is shown to the satisfaction of the collector that such inspection, etc., at such regular place of lading is physically impracticable, and then only upon the condition that the applicant pay the expenses of inspection, etc.

\* \* \* \* \* \* \*

Art. 1054. Failure to obtain actual inspection and supervision of lading.— (a) Whenever the inspecting officer is unable to certify to the actual inspection and lading of the merchandise, he shall, in making his return, state the reason therefor, the date and hour of receipt of the notice of intent and of the lading of the merchandise, and whether or not a shipper's notice of intent accompanied the goods; and shall, after the vessel or cars have cleared, examine the records of the delivering and exporting steamship or transportation lines for the purpose of verifying the particulars stated in the notice of intent to export and make his certificate accordingly whether the notice was timely or not.

(b) In such cases the certificate of the inspector shall be accepted as sufficient evidence of lading, and the drawback will be allowed, provided the notice of intent was timely and the regulations were otherwise complied with, and the failure to inspect was not the fault of the exporter or carrier or the agent of either.

The defendant's position is that the failure to inspect the drums was the fault of the exporter. The facts developed by the record in relation thereto are these: Upon application of the exporter Customs

Inspector Clinton H. Kern attached to the port of New Orleans was detailed by the proper customs officer to proceed to a place called St. Rose to supervise the lading of certain drums filled with gasoline, which drums were alleged to be the subject of drawback. There is no dispute that only part of the drums containing gasoline which were to be laden on board the exporting vessel were drums on which drawback was to be claimed, and these were identifiable only by the embossed mark "D" on one head of the drums.

When the inspector arrived at St. Rose he found two piles of drums on the wharf, amounting to 300 drums in all. One pile, he said, he was able to check, and found them to be drawback drums covered by an entry not here involved. The other pile he found to be "all mixed on the wharf" and he testified that it was a physical impossibility to check them due to the fact that the heads which may or may not have been embossed were not in a position where he could see them, being face down. He did not consider it his duty to move the drums so that he could examine the heads, and we think this attitude on his part was correct, for the regulation, article 1053, provides that the exporter

* * * must in all cases provide the requisite opportunity and the necessary facilities for official inspection * * *.

The inspector took up the matter with the representatives of the exporter, who told him they were not interested in drawback, and he then informed his superior. He was informed that the matter had been taken up with the customhouse broker of the drawback claimant and with the manufacturers of the drums, but nothing was done.

So much for the drums which the inspector found on the wharf upon his arrival. The method of handling the drums and the gasoline appears from the record to have been as follows: The drums, both the drawback drums and others, were received at the loading plant at St. Rose by dray. They were put on conveyors which carried them to some five or six loading spouts, where they were filled. After that, they were rolled on their sides to what was called the "front of the barrel house" where they were upended and counted by representatives of the vessel, the exporter, and a petroleum inspector. They were then put on a conveyor in a vertical position and carried down 18 or 20 feet to the wharf, where they were piled if the ship was not loading at the time, or were loaded on the ship.

It does not appear that any particular effort was made at any time by the exporter to see to it that the heads containing the embossed "D" were in a position in which the inspector detailed to supervise the lading of merchandise exported for benefit of drawback could see and check them.

From testimony elicited by counsel for the plaintiff from Inspector Kern on cross-examination it appears that had the latter stationed

himself in the barrel house and observed the drums as they were being rolled to the conveyor, or at the conveyor as the drums were being lifted thereon, he could have observed and made note of such of the drawback drums as might have had their heads turned toward him. We do not think that the mere leaving to chance that the embossed head of the drawback drums would be turned toward an inspector while they are in motion, is provision of the "requisite opportunity and the necessary facilities for official inspection" required by the regulations. Some reasonable method of giving the inspector an opportunity to satisfy himself as to the identity of the goods should be provided *by the exporter*, and the record shows that no such opportunity was provided.

The record contains evidence that as to some previous shipments made in the same manner another customs inspector was able to return a certain number of drums as drawback drums. Examination of the testimony of this inspector shows that he relied to a great extent upon such checks of the drums as were made by other persons, employees of the exporter or the carrier, and he admitted that he "did not attempt to make 100 per cent examination." It seems to us that whatever latitude this customs inspector allowed himself can have no bearing upon the situation with respect to Inspector Kern's detail. The latter was entitled to a reasonable opportunity and reasonable facilities to inspect the drums, which were not afforded him, and we hold that the failure to inspect was the fault of the exporter.

In the brief filed on behalf of the plaintiff it is suggested that the failure to inspect was due to the fact that one inspector could not do the work by himself. We do not find this suggestion to be supported by the record.

As the mandatory customs regulation contained in article 1053 was not complied with, the collector was justified in refusing to allow drawback, and the protest is therefore overruled.

Judgment will issue accordingly.